**TRIPLE U ENTERPRISES, INC., a corporation; L.R. Houck and Jerry Houck, Plaintiffs,**

v.

**NEW HAMPSHIRE INSURANCE COMPANY, a corporation, Defendant.**

**No. CIV. 83–5070.**

United States District Court,
D. South Dakota, W.D.

Aug. 11, 1983.

Joseph M. Butler, Bangs, McCullen, Butler, Foye & Simmons, Rapid City, S.D., for plaintiffs.

Gary H. Richards, Richards, Hood & Brady, Spearfish, S.D., for defendant.

## MEMORANDUM OPINION

BOGUE, Chief Judge.

This diversity action comes before the Court on cross motions for summary judgment. Plaintiffs contend that Defendant breached its contract of insurance by refusing to defend and by refusing to provide coverage. Defendant asserts that it breached no duty to defend because Plaintiffs' claim is not covered under the insurance policy. This Court holds that Defendant breached its contract of insurance by wrongfully refusing to defend and that Plaintiffs are entitled to summary judgment on that issue.

### I.

Plaintiff, Triple U Enterprises, Inc., is a South Dakota corporation, of which Plaintiffs L.R. Houck and his son, Jerry Houck, are officers and shareholders, engaged in the farming and ranching business. The Defendant, New Hampshire Insurance Company, is a corporation organized and existing under the laws of a state other than South Dakota. The Defendant is engaged in the business of selling insurance with its principal offices located outside South Dakota.

On February 23, 1976, Plaintiffs entered into a contract of liability insurance with Defendant, entitled "Farmer's Comprehensive Personal Liability Endorsement" (Triple U policy).[1] The policy was for an original term of three years from February 23, 1976, to February 23, 1979, and was renewed for an additional three-year term from February 23, 1979, to February 23, 1982.[2] The policy provided in pertinent part as follows:

A. Houck by New Hampshire Insurance Company.

1. This endorsement, effective 2–23–76, formed a part of policy No. CFP 28–46–09 issued to Triple "U" Inc., Triple "U" Enterprises, L.R. Houck, Jerry Houck, Tom Houck, James Ingle, and Jim

2. On December 5, 1978, a Change Endorsement attached to the insurance policy effected an

### I. COVERAGE L—PERSONAL LIABILITY

The company will pay on behalf of the *insured* all sums which the *insured* shall become legally obligated to pay as *damages because of . . . property damage to which this insurance applies, caused by an occurrence,* and *the company shall have the right and duty to defend any suit against the insured seeking damages on account of such . . . property damage* even if any of the allegations of the suit are groundless, false or fraudulent . . . .

Exclusions

This coverage does not apply:

(f) to liability assumed by the *insured* under any contract or agreement not in writing or under any contract or agreement in connection with business pursuits (other than *farming*) or professional services of the insured or in connection with *property damage* included within the *fire hazard; but this exclusion does not apply to a warranty of goods or products;*

(m) to *property damage* to products manufactured, sold, handled or distributed by any insured or work performed by or for any *insured,* arising out of such products or work or any part thereof;

### VIII. DEFINITIONS

When used in reference to this insurance (including endorsements forming a part of this insurance):

"occurrence" means an accident, including continuous or repeated exposure to conditions, which results in . . . *property damage* neither expected nor intended from the standpoint of the *insured;*

"property damage" means (1) *physical injury to or destruction of tangible property* which occurs during the endorsement period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an *occurrence* during the endorsement period; (emphasis added).

### II.

On September 12, 1978, and March 23, 1979, Plaintiff, Triple U Enterprises, Inc., (Triple U) sold 650 head of buffalo to Adolph, LaVern and Ward Hepper (Heppers) for purposes of breeding.[3] It is alleged that the buffalo were infected with brucellosis and were not fit for breeding. On May 19, 1980, Heppers brought suit against Triple U, alleging damage as a result of Triple U's breach of the two sales contracts.

Specifically, the original complaint,[4] which Heppers filed in the Hughes County, South Dakota, Sixth Circuit Court, alleged in paragraph 3 of the first cause of action that:

### III.

At the time of each of said contracts Defendant [Triple U] knew all of such buffalo were being purchased for breeding purposes and by implication and expressly warranted the same to be fit for breeding purposes. At the time of each of said sales, Defendant represented that the buffalo would yield from eighty to ninety percent calf crop generally with

increase in the liability limits from $300,000 to $500,000 for each occurrence.

3. The September 12, 1978, sale consisted of 366 buffalo heifers and 34 buffalo bulls, while the March 23, 1979, sale consisted of 230 buffalo heifers and 20 buffalo bulls.

4. Heppers filed an amended complaint on October 8, 1982, naming L.R. Houck and Jerry Houck as additional defendants. The amended complaint reflected additional allegations in paragraphs III, IV and IX of the first cause of action, in paragraph III of the second cause of action, and in paragraph II of the third cause of action, plus a change in the prayer for relief. The Court notes that Defendant in this case has maintained its "no coverage" position from the beginning of this matter to the present, demonstrating Defendant's position that neither the original complaint nor the amended complaint contains allegations that fall within the coverage provisions of the Triple U policy.

nearly one hundred percent from the four-year-old cows, that all of the buffalo were free of disease and that it was not necessary to vaccinate buffalo for brucellosis....[5]

Plaintiffs [Heppers] relied upon the implied and express warranties and the representations of Defendant. Plaintiffs' consent to the contracts was obtained through the fraudulent representations by Defendant.[6]

### V.

In fact, the buffalo were infected with brucellosis and contagious abortion so that less than fifty percent of the mature buffalo cows could produce calves and none were fit for breeding purposes.

Further, in paragraph 3 of the second cause of action, it was alleged that:

### III.

As a direct result of the breaches of implied and express warranties and the fraudulent misrepresentations by Defendant and as a consequence of such buffalo not meeting the general and particular breeding requirements of which Defendant had knowledge at the time of contracting, *Plaintiffs lost 180 calves that should have been produced in 1979, suffered damage in the difference in value of the buffalo for breeding and slaughter, difference in value of the calves that were dropped because of being unfit for breeding, similar losses for the 1980 season and risk of infection of other stock of Plaintiffs and others* and Plaintiffs have also incurred incidental damages in the inspection, transportation and care and custody of the buffalo in the total sum of Four Hundred Thousand and no/100 Dollars ($400,000.00).[7] (Emphasis added.)

Finally, Plaintiffs demanded judgment of Defendant as follows:

1. That the contracts be declared cancelled, that Defendant be required to take redelivery of the buffalo the subject of said contracts and that Plaintiffs have a security interest in such buffalo for the amounts paid by them, interest and their expenses;

2. That Plaintiffs have judgment against Defendant for actual damages in the sum of Four Hundred Thousand and no/100 Dollars ($400,000.00) ....[8]

Upon receipt of the complaint, Triple U, through L.R. Houck, tendered the defense to Defendant. The Defendant refused to defend, claiming there was no coverage under the insurance policy for the allegations contained in Heppers' complaint.[9] It

---

5. In the amended complaint, the first line in paragraph III of the first cause of action contained additional allegations as follows: "At the time of each of said contracts Defendants knew *and had reason to know* all of such buffalo were being purchased for breeding purposes *and that the Plaintiffs were relying on the Defendants' skill or judgment to select or furnish suitable breeding buffalo* and by implication and expressly warranted the same to be fit for breeding purposes." (Emphasis added.)

6. Paragraph IV in the first cause of action of the amended complaint reads as follows: "Plaintiffs relied *upon the seller's skill or judgment to select and furnish suitable breeding buffalo and* upon the implied and express warranties and representations of Defendants. Plaintiffs' consent to the contracts was obtained through the fraudulent representations by Defendants and the *implied and express warranties and representations.*" (Emphasis added.)

7. Plaintiffs in the amended complaint alleged total damages in the amount of $800,000.

8. Plaintiffs amended their prayer for relief as follows: "WHEREFORE, Plaintiffs demand judgment of Defendant Triple U Enterprises, Inc., based upon breach of implied and express warranty and against said Defendant and Defendants L.R. Houck and Jerry Houck on the grounds of misrepresentation and deceit actual damages in the sum of Eight Hundred Thousand and no/100 Dollars ($800,000.00) and against each of said Defendants punitive damages in the sum of Eight Hundred Thousand Dollars and no/100 Dollars ($800,000.00)...." Exhibit 14, p. 6, L.R. Houck Affidavit.

9. On or about May 27, 1980, Plaintiffs were advised "that there is no evidence of Bodily Injury or Property Damage that would place this matter within the scope of coverage under the Farmers Comprehensive Personal Liability endorsement." Exhibit 3, L.R. Houck Affidavit. Further, Defendant replied by letter, dated April 22, 1981, to a request for coverage on behalf of Triple U Enterprises, Inc., by Plaintiff L.R. Houck's nephew, Jim Houck, stating:

is not disputed that the insurance policy was in full force and effect at the time of the two sales transactions.[10]

At the trial, which began on April 11, 1983, Heppers presented the following itemization of their damages for each of the two sales transactions.

Ward Hepper Herd
9–12–78 Purchase
Dewey County Ranch

TOTAL DAMAGE

| | | |
|---|---|---|
| Cost of Original Herd | $284,900 | |
| Three years expected calf crop | 466,787 | |
| Total Value and Income | | $751,687 |
| Less Net Sale Proceeds | $ 83,343 | |
| Less Unpaid Portion of Purchase Contract | 93,333 | |
| | | ($176,676) |
| Total Loss | | $575,011 |

Adolph Hepper Herd
3–23–79 Purchase
Corson County Ranch

TOTAL DAMAGE

| | | |
|---|---|---|
| Value of herd if disease free | $349,050 | |
| Value of diseased herd | (156,179) | |
| Loss of Value | | $212,871 |
| Loss on meat sold and on storage | | 128,507 |
| Loss profits – lost calf crop | | 69,948 |
| Incidental Expenses | | 46,170 |
| Less unpaid portion of purchase contract | | (108,733) |
| TOTAL DAMAGES | | $347,763 |

"This is to advise you that there is no 'products' coverage under the FCLP policy."

"As previously outlined, the claim in question dealt mainly with the failure of your product (buffalo), to perform up to expectations. There is no claim of negligence nor of bodily injury or property damage other than to the buffalo."

"In view of this there would be no coverage for the loss." *Id.* Exhibit 4.

Defendant similarly advised Plaintiffs of its position by letters dated May 15, 1981, July 28, 1982, and May 3, 1983. *Id.* Exhibits 5, 6, 7, 8, 9. Specifically, in the July 28, 1982, letter, Defendant asserted its position:

"Nowhere in the [state court] complaint do we find an allegation with respect to bodily injury or property damage arising out of an occurrence (accident). Additionally, nothing in the complaint alleges 'bodily injury' or 'property damage' as defined within the policy.

The jury returned a general verdict for Heppers on their claim against Triple U for breach of warranty in the amount of $286,-232. Additionally, the jury found that L.R. Houck and Jerry Houck were not liable for deceitful misrepresentations. Subsequently, Plaintiffs requested that Defendant provide insurance coverage and pay the judgment entered against them in state court. Defendant again refused to provide coverage.

### III.

Plaintiffs, Triple U, L.R. Houck and Jerry Houck, brought the action at bar, alleging that Defendant breached its duty under the insurance contract by wrongfully refusing to defend the state court suit brought by Heppers, and by wrongfully denying coverage for that portion of the state court complaint relating to breach of express and implied warranties. Plaintiffs assert that that portion of the state court complaint seeking damages to property other than the buffalo that were sold, fall within the Triple U policy coverage provisions. Further Plaintiffs maintain that as a proximate result of Defendant's breach of the insurance contract, Plaintiffs suffered $286,732 damages, the amount of the jury verdict, plus costs and expenses incurred in connection with the defense of the state court suit in the amount of $55,-000. Finally, Plaintiffs contend that De-

"In addition to the above damage to or failure of the insured's product (buffalo) is not covered. We refer you to the 'Exclusions' section of the policy which indicates 'this coverage does not apply; (m) ....'" *Id.* Exhibit 7.

10. Defendant conceded in its responsive memorandum brief that it "has no reason at this time to dispute the facts as presented by the Plaintiffs. Although Defendant somehow seeks to "reserve the right to dispute the Statement of Facts contained in the Plaintiffs' Brief," Defendant's Memorandum Brief, p. 1, Fed.R.Civ.P. 56(a) is clear that if an adverse party disagrees with the facts as stated by his opponent, he must set forth specific facts, by affidavits or as otherwise provided in Rule 56, showing that there is a genuine issue for trial. Defendant has set forth no specific facts pursuant to Rule 56, by affidavit or otherwise, to join issue in this matter. Therefore, this Court necessarily must proceed to determine the matters of law before it.

fendant's refusal to defend and to provide coverage is vexatious and without reasonable cause, entitling Plaintiffs to reasonable attorney fees in connection with this action.[11]

The questions involved in this case are matters to be determined by South Dakota law. *St. Paul Fire & Marine Ins. Co. v. Northern Grain Co.*, 365 F.2d 361, 368 (8th Cir.1966). The Eighth Circuit has stated clearly that it is not this Court's task to "formulate the legal mind of the state, but merely to ascertain and apply it." *Id.*, citing, *Village of Brooten v. Cudahy Packing Co.*, 291 F.2d 284, 288 (8th Cir. 1961). This Court must endeavor to determine what the Supreme Court of South Dakota would, on the facts before the Court, declare the law of this state to be. *Id.*

■ Generally, under a liability insurance policy obligating the insurer to defend all suits brought against the insured even though groundless, false or fraudulent, the insurer is still not liable to defend a suit based on a claim outside the coverage of the policy. *Black Hills Kennel Club, Inc. v. Fireman's Fund Indemnity Co.*, 77 S.D. 503, 94 N.W.2d 90 (1959). Conversely, where an insurer wrongfully refuses to defend on the ground that the claim is not within policy coverage, the insurer is guilty of breach of contract, rendering it liable to the insured for all damages resulting to him because of such breach. *See Taylor v. Imperial Cas. & Indemnity Co.*, 82 S.D. 298, 144 N.W.2d 856 (1966); *Babcock & Wilson Co. v. Parsons Corp.*, 298 F.Supp. 898 (D.Neb.1969), *aff'd in part and rev'd*

*in part on other grounds*, 430 F.2d 531 (8th Cir.1970). Moreover, if an insurer refuses to defend, asserting that the insured's claim is based on facts excluded from policy coverage, and if the insurer decides to await the determination of its obligation in a subsequent proceeding against it, it must do so at its own peril; if the insurer guessed wrong, it must bear the consequences of its breach of contract. Annot., 49 A.L.R.2d 694, 700 (1956).

■ Specifically, under South Dakota law, an insurer has a duty to defend, if the complaint alleges facts, which if proven, would result in coverage. *Haugan v. Home Indemnity Co.*, 86 S.D. 406, 197 N.W.2d 18 (1972). Annot., 50 A.L.R.2d 458, 465 (1956). This Court therefore must determine whether the Triple U policy provides coverage for the allegations in Heppers' complaint, and more particularly, whether Defendant had a duty to defend.

## IV.

In Heppers' state court complaint, they asserted two theories of recovery: first, breach of implied and express warranties; and second, fraudulent (deceitful) misrepresentation. Further, Heppers' complaint alleged essentially four items of damage: first, diminution in value of the buffalo that were sold; second, loss of expected calf crops; third, diminution in value of calves born; and fourth, damage for risk of infection of other stock.[12] Plaintiffs readily concede that the fraudulent misrepresentation theory and the first item of damage, diminution in value of the buffalo that were sold,[13] are not within the coverage

---

11. In their Motion for Summary Judgment, Plaintiffs moved the Court pursuant to SDCL 58–12–3.1 for a separate hearing on the issue of reasonable attorney's fees. SDCL 58–12–3.1 provides:

> The determination of entitlement to an allowance of attorney fees as costs and the amount thereof under 58–12–3 shall be made by the court ... at a separate hearing of record subsequent to the entry of a judgment or award in favor of the person making claim against the insurance company, and, if an allowance is made, the amount thereof shall be inserted in or added to the judgment or award. Such

a hearing shall be afforded upon the request of the claimant made within ten days after entry of the judgment or award.

12. Plaintiffs do not contend that "incidental damages in the inspection, transportation and care and custody of the buffalo as alleged in Heppers' state court complaint, are within the coverage provisions. *See,* Exhibit 2, p. 5, L.R. Houck Affidavit.

13. Plaintiffs admit that Exclusion (m) of the Triple U policy precludes coverage for any damage to the buffalo themselves.

provisions of the Triple U policy. Plaintiffs do contend, however, that the warranty theory and the remaining three damage items are within the coverage provisions, giving rise to Defendant's duty to defend the state court action. Whether that theory and those damages are covered by Defendant's policy controls whether Defendant had a duty to defend in Heppers' action. To make this determination, this Court must resolve the following issues presented by the record: 1) whether there were "damages because of ... 'property damage'"; 2) whether such damages were caused by an "occurrence"; 3) whether Exclusion (f) operates to provide coverage for damages resulting from breach of warranty; 4) whether Exclusion (m) operates to preclude coverage for the damages alleged; and 5) if Defendant had a duty to defend, what are the consequences for breach of that duty.

### A.

"Property damage" as defined in the Triple U policy means "physical injury to or destruction of tangible property." Plaintiffs rely exclusively on *St. Paul Fire and Marine Ins. Co. v. Northern Grain Co.,* 365 F.2d 361 (8th Cir.1966), for the proposition that damages for loss of expected calf crops, for diminution in value of calves born, and for the risk of infection of other stock are within the definition of "property damage" in the Triple U policy. Although Plaintiffs assert that the above definition of "property damage" was considered by the Eighth Circuit Court of Appeals in *Northern Grain,* this Court cannot totally agree.

In *Northern Grain* there was no specific definition of property damage in the insurance policy. Furthermore, the court was faced with language in the general insuring clause, *i.e.,* "damages because of injury to or destruction of property," unlike that in the general insuring clause of the Triple U policy. In that case, an insured grain elevator mistakenly sold to farmers wheat seed less productive than the seed ordered by the farmers. Claims were made by the farmers seeking damages for diminution in the yield of the resulting wheat crop. Giving a broad interpretation to the term 'property,' the Eighth Circuit held that the diminution in the productivity of the wheat crop, as the result of an inferior and deficient quality of wheat seed, constituted property damage within the coverage of that policy. *Northern Grain Co.,* 365 F.2d at 366.

The court in *Northern Grain* relied on *Hauenstein v. Saint-Paul Mercury Indemnity Co.,* 242 Minn. 354, 65 N.W.2d 122 (1954) and *Dakota Block Co. v. Western Casualty and Surety Co.,* 81 S.D. 213, 132 N.W.2d 826 (1965), to define the scope of property damage under that policy. The Eighth Circuit regarded *Hauenstein* and *Dakota Block* "as establishing the principle that consequential or *intangible* damages, in addition to direct physical damage to other property," constituted property damage within the terms of that policy. *Id.* Consequently, though no direct physical damage resulted to the wheat crop itself, the court held that there was property damage of a consequential or intangible nature. *Id.* The measure of that consequential or intangible property damage was the diminution in the yield of the wheat crop. *Id.*

In *Hauenstein,* like *Northern Grain,* there was no specific definition of property damage. The Minnesota Supreme Court interpreted language in the general insuring clause identical to that in *Northern Grain*—"damages because of injury to or destruction of property"—to define the scope of property damage. Though no visible physical injury resulted to the building, the court held that the presence of defective plaster, supplied by the insured distributor, on the walls and ceilings of a hospital building constituted property damage. *Hauenstein,* 65 N.W.2d at 125.

> The measure of damage [was] the diminution in the market value of the building, or the cost of removing the defective plaster and restoring the building to its former condition plus any loss from de-

prival of use, whichever [was] the lesser. [ ]

Similarly in *Dakota Block,* the insurance policy contained no explicit definition of property damage. The language in the general insuring clause was identical to that in *Northern Grain* and *Hauenstein.* In *Dakota Block,* an insured seller of concrete blocks sold to a masonry contractor colored blocks which were used in the construction of a school building. The blocks were defective causing discoloration and a mottled appearance on the outside of the building. The South Dakota Supreme Court aligned itself with the reasoning employed in *Hauenstein* insofar as the element of property damage was concerned. Despite the absence of any detectable physical damage to the building, the court held that there was property damage to the entire building which was caused by the insured's defective product. *Dakota Block Co.,* 132 N.W.2d at 830. The measure of damages was the diminution in value of the building or the cost to repair, whichever was the lesser. *Id.; Hauenstein,* 65 N.W.2d at 125.

*Hauenstein, Dakota Block,* and *Northern Grain* defined property damage in the context of a broad interpretation of "property" and the type of alleged injury to that property. Indeed, the court in *Northern Grain* was "not inclined to adopt a narrow construction of the term 'property', especially in view of the fact that it [was] used without limitation." *Northern Grain Co.,* 365 F.2d at 367. Additionally, the Eighth Circuit instructed that "[the insured] could have explicitly excluded ... consequential products liability, if it had so chosen, by reference to specific language in the insuring agreement," citing, for example, the language of the insuring agreement in *Pittsburgh Plate Glass Co. v. Fidelity & Cas. Co. of N.Y.,* 281 F.2d 538 (3rd Cir. 1960). *Id.*

The language of the general insuring clause in *Pittsburgh Plate Glass* required the insurer to pay "for damages because of physical injury to or physical destruction of tangible property." The Eighth Circuit in-

dicated that the wheat crop in *Northern Grain* was tangible property, 365 F.2d at 366. The *Pittsburgh Plate Glass* language leads to the conclusion that liability for diminution in the yield of the *Northern Grain* wheat crop is excluded. Such conclusion inures from the fact that even though there is tangible property, *i.e.,* the wheat crop, there is no "physical injury" to the wheat crop itself.

The Triple U general insuring clause, with the definition of "property damage" substituted therein, contains language substantially identical to that in the *Pittsburgh Plate Glass* case. Under the Triple U policy, Defendant is required to pay on behalf of Plaintiffs "damages because of ... physical injury to or destruction of tangible property." Because the terms of the Triple U policy fix any right to recovery, *Taylor v. Imperial Cas. & Indem Co.,* 82 S.D. 298, 144 N.W.2d 856, 858 (1966), this Court's construction of the Triple U policy necessarily involves interpretation of "tangible property" and "physical injury to" that tangible property, in the context of the damages alleged in the Heppers' state court complaint.

This Court's research has not found, nor have the parties cited, any South Dakota law directly interpreting "physical injury to ... tangible property." Basic insurance law principles, however, demand that this language be construed according to its plain and ordinary meaning. *Grandpre v. Northwestern Nat. Life Ins. Co.,* 261 N.W.2d 804, 807 (S.D.1977). Further, this language is to be construed liberally in favor of the insured and strictly against the insurer, but only when the language is ambiguous and susceptible of more than one interpretation. *Strong v. State Farm Mut. Ins. Co.,* 76 S.D. 367, 78 N.W.2d 828 (1956); *Northern Grain Co.,* 365 F.2d at 367.

"Tangible" is defined as

[h]aving or possessing physical form. Capable of being touched and seen; perceptible to the touch; tactile; palpable; capable of being possessed or realized;

readily apprehensible by the mind; real; substantial.

Black's Law Dictionary 1305 (5th Ed.1979). Webster's Third New International Dictionary 2337 (1966) defines "tangible property" as "property (as real estate) having physical substance apparent to the senses," while Black's Law Dictionary 1305 (5th Ed. 1979) describes "tangible property" as "[t]hat which may be felt or touched, and is necessarily corporeal ... *H.D. & J.K. Crosswell, Inc. v. Jones,* D.C.S.C., 52 F.2d 880, 883." *See* 73 C.J.S. Property § 5 (1951). Numerous courts interpreting the above definitions in the context of a liability insurance policy have concluded that strictly economic losses, like lost profits, loss of the anticipated benefit of a bargain, loss of an investment, and loss of goodwill, reputation, or business standing, do not constitute damage or injury to tangible property covered by a comprehensive general liability policy. *Liberty Mut. Ins. Co. v. Consolidated Milk Producers Assn.,* 354 F.Supp. 879, 884 (D.N.H.1979); *Johnson v. Tally Ho, Inc.,* 303 A.2d 677, 679 (Del.Super.1973); *Giddings v. Industrial Indem. Co.,* 112 Cal.App.3d 213, 217, 219, 169 Cal. Rptr. 278, 281 (Ct.App.1981), and cases cited therein. *See* Annot., 92 A.L.R.3d 525 (1979); *Lay v. Aetna Ins. Co.,* 599 S.W.2d 684, 686 (Tex.Civ.App.1980); *Ludwig Candy Co. v. Iowa Nat. Mut. Ins.,* 78 Ill.App.3d 306, 33 Ill.Dec. 605, 608, 396 N.E.2d 1329, 1332 (1979). *But see Safeco Ins. Co. v. Munroe,* 165 Mont. 185, 527 P.2d 64 (1974). *See also Labberton v. General Cas. Co.,* 53 Wash.2d 180, 332 P.2d 250 (1958).

"Loss of expected calf crops", which ostensibly connotes calves that were never born, and "risk of infection of other stock" do not constitute any type of injury to "tangible property." *Id.* These alleged damages or losses might be considered "property," *i.e.,* intangible property, *see Hamilton Die Cast, Inc. v. United States Fidelity & Guar. Co.,* 508 F.2d 417, 419 (7th Cir.1975), under a broad interpretation of the term "property". *See Northern Grain Co.,* 365 F.2d at 367; *Johnston v. Tally Ho, Inc.,* 303 A.2d 677, 679 (Del.Super.1973). But, giving the limiting term "tangible" its plain, usual, and ordinary meaning, this Court cannot construe "loss of expected calf crops" and "risk of infection" as coming within such term. *See Lowenstein Dyes & Cosmetics v. Aetna Life & Cas. Co.,* 524 F.Supp. 574, 577 (E.D. N.Y.1981); *Yakima Cement Products Co. v. Great American Ins. Co.,* 14 Wash.App. 557, 544 P.2d 763, 765 (1976).

On this same basis, however, the alleged damage to calves that were born and in existence, necessarily fits within the plain language of "tangible property." *Cf. General Ins. Co. of America v. Gauger,* 13 Wash.App. 928, 538 P.2d 563 (1975) (wrong type of seed wheat sold resulted in injury to tangible property, *i.e.,* the wheat field and wheat crop). In order to fall within the Triple U policy, however, the damage or injury to these calves also must be "physical injury."

Generally, "physical injury" is defined as "[b]odily harm or hurt .... See also Physical harm." Blacks Law Dictionary 1032 (5th Ed.1979). "The words 'physical harm' are used throughout the Restatement of Torts to denote the physical impairment of ... chattels. Restatement, Second, Torts § 7." *Id. See generally State of Vermont v. Glens Falls Ins. Co. Inc.,* 132 Vt. 97, 315 A.2d 257, 259 (1974) (disappearance of colored slides not "physical injury to or destruction of tangible property"); *General Ins. Co. of America v. Palmetto Bank,* 268 S.C. 355, 233 S.E.2d 699, 701 (1977) (wrongful deprivation of property not physical injury to property).

The Oregon Supreme Court had occasion in *Wyoming Sawmills, Inc. v. Transportation Ins. Co.,* 282 Or. 401, 578 P.2d 1253 (1978), to define "physical injury to ... tangible property" under a comprehensive general liability insurance policy. There, an insured lumber manufacturer sold studs which were used in the construction of buildings. The studs were warped, twisted, or otherwise defective and had to be replaced. Claim was made for labor expense in taking out the defective studs and in replacing them with non-defective ones.

Rejecting the principle enunciated in the *Hauenstein* and *Dakota Block* cases, the court held that

> [t]he inclusion of [the] word ['physical'] negates any possibility that the policy was intended to include 'consequential or intangible damage,' [ ] such as depreciation in value within the term 'property damage.' The intention to exclude such coverage can be the only reason for addition of the word. As a result, in the absence of a showing that *any physical damage was caused to the rest of the building by the defective studs* and that the labor cost was for the rectification of any such damage, [the insured] cannot recover.

*Wyoming Sawmills*, 578 P.2d at 1256. (Emphasis added.)

At first glance, applying *Wyoming Sawmills* to the instant case, it appears that diminution in value of calves born, which is ostensibly "consequential or intangible damage," cannot come within the term "property damage" as defined in the Triple U policy. But, upon closer inspection, it becomes readily apparent that such conclusion is not correct under the facts of this case. It is extremely important to recognize that the *ratio decidendi* in *Wyoming Sawmills* is that there was no *physical damage* to the remainder of the building. *Id.* It is on this basis, in the context of the construction of a building, that depreciation in value of such building is not "property damage." *Cf. United States Fidelity & Guar. Co. v. Nevada Cement Co.*, 93 Nev. 179, 561 P.2d 1335, 1337–38 (1977) (defective cement which weakened structural integrity of building was injury to tangible property). In *Wyoming Sawmills* the products sold were the studs, compared to the buffalo in the instant case; further, the building is properly compared with the calves born. There was no physical injury alleged to the building, only the consequential labor expense needed to replace the defective studs. In the case at bar, therefore, the question is whether physical injury to the calves born was alleged.

In Heppers' state court complaint, they alleged: first, that Triple U knew the buffalo were being purchased for breeding purposes; second, that Triple U made representations as to the calf crop yield; third, that Triple U represented that all of the buffalo were free of disease; fourth, that the buffalo were infected with brucellosis and contagious abortion; fifth, that less than 50% of the mature buffalo cows could produce calves and none were fit for breeding; and sixth, that as a direct result of Triple U's breach of warranties, Heppers' suffered damage in the difference in value of the calves that were dropped because of being unfit for breeding. These allegations show that proof at trial necessarily requires a showing that the calves contracted disease from the bulls and cows, whether during the birth process or at a later time. Otherwise, there is no reason to ask for damages to the calves. If these allegations were proved at trial, the calves necessarily are infected with a disease that makes them unfit for breeding. Suffice it to say, without more, that the calves are physically injured. This Court holds, therefore, that the alleged damage to the calves born is "property damage" within the meaning of the Triple U policy.

For the sake of clarity, the measure of damages to these animals was pled as diminution or depreciation in value of the calves. But, most importantly, this measure is a measure of damage for "physical injury to . . . tangible property". A California court, interpreting policy language identical to that in the instant case, recognized this very principle:

> A complaint seeking to recover [economic losses] from an insured falls within the scope of insurance coverage only where these intangible economic losses provide 'a measure of damages to physical property which is within the policy's coverage.' (*Hogan v. Midland National Ins. Co., supra*, 3 Cal.3d 553, 562–63, 91 Cal. Rptr. 153, 476 P.2d 825; *Geddes & Smith, Inc. v. St. Paul Mercury Indem. Co., supra*, 63 Cal.2d 602, 609 [47 Cal. Rptr. 564, 407 P.2d 868]).

*Giddings,* 169 Cal.Rptr. at 281. *See also Safeco Ins. Co. v. Munroe,* 165 Mont. 185, 527 P.2d 64 (1974). It is apparent, therefore, that the type or measure of damage is not dispositive; it is the type of injury to tangible property. In the instant case, there is physical injury, a disease, to tangible property, the calves that were born, for which damage is measured by diminution in value.

### B.

"Occurrence" as defined in the Triple U policy means "an accident including continuous or repeated exposure to conditions, which results in ... property damage neither expected nor intended from the standpoint of the insured." Plaintiffs rely solely on the *Northern Grain* and *Dakota Block* cases to support their contention that the alleged damages to calves born resulting from the alleged breach of warranties were caused by an "occurrence".

The court in *Northern Grain* interpreted the term "accident" to include the sale of wrong seed wheat.

> In light of the broad and liberal judicial interpretation of the term 'accident' as used in general liability policy, particularly in a policy which, as is true here, insures against 'Products Hazard', we are of the firm view, and so hold, that the occurrence under consideration satisfied the requirement that the claimed damages were caused by accident. The result flowing from the sale of the improper seed wheat was an unexpected, unforeseen and fortuitous event.

*Northern Grain Co.,* 365 F.2d at 365. *See Dakota Block Co.,* 132 N.W.2d at 827.

As used in general comprehensive liability policies, "occurrence" connotes a broader coverage than "accident." 7A J. Appleman, *Insurance Law and Practice* § 4493, p. 49 (1979). The definition of "occurrence" eliminates any need for an exact finding of the cause of the alleged damage, but only requires that such damage is neither expected or intended from the standpoint of the insured. *Id.*

There can be no question but that the alleged damage to the calves born in the instant case was neither expected nor intended from the standpoint of Plaintiffs. *Id.; See Northern Grain Co.,* 365 F.2d at 365. According to the allegations in Heppers' complaint, Plaintiffs, as sellers, provided warranties to the buyers regarding the fitness of the buffalo for breeding. The result flowing from the sale of the allegedly diseased buffalo was an unexpected, unforeseen and fortuitous event. *Id.* Moreover, if proven, the allegations in Heppers' complaint showed that the calves born were subjected to a continuous and repeated exposure to the diseased condition of the bulls and cows. On this basis, the Court holds that the alleged damage to the calves born was caused by an "occurrence" within the meaning of the Triple U policy.

### C.

Plaintiffs contend that Exclusion (f) in the Triple U policy provides coverage for damages resulting from breach of warranty. Because of the "exception to the exclusion" language in Exclusion (f),—"but this exclusion does not apply to a warranty of goods or products,"—Plaintiffs maintain that coverage for breach of express or implied warranty is recognized and provided for in such language. Defendant, on the other hand, relies on *Haugan v. Home Indemnity Co.,* 86 S.D. 406, 197 N.W.2d 18 (1972), for the proposition that South Dakota law does not recognize nor does it provide for breach of warranty coverage based on the exception to Exclusion (f).

*Haugan* was a declaratory judgment action involving the same litigation structure as the instant case, but in the context of building construction. In that case, the owner brought action against its general contractor for alleged damages to an airplane hangar building. The general contractor, in turn, brought the declaratory action against his insurer seeking a determination of coverage under his liability insurance policy.

In the owner's principal action, the complaint alleged, *inter alia,* that the contrac-

tor failed to perform his work in a workmanlike manner, causing the foundation of the building to settle. The general insuring clause of the contractor's policy contained identical language as appears in the general insuring clause in the Triple U policy. The applicable exclusions in *Haugan*, similar in nature to Exclusions (f) and (m) in the instant case, provided:

"This insurance does not apply:

(a) to liability assumed by the *insured* under any contract or agreement except on *incidental contract; but this exclusion does not apply to a warranty of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner;*

(m) to *property damage*, to work performed by or on behalf of the *named insured* arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;" (Emphasis added.)

The South Dakota Supreme Court held that "[t]he alleged facts clearly subjected the owner's claim to the unambiguous provisions of exclusion (m) which, without qualification, denies coverage for liability on a claim arising out of damage to the *work or product of the insured." Haugan*, 192 N.W.2d at 22. (Emphasis added.) Further, in reconciling exclusion (a) and the exception to exclusion (a), with exclusion (m), the court stated:

Exclusion (a) does not extend or grant coverage. To the contrary it is a limitation or restriction on the insuring clause. The exception to exclusion (a) merely removes breach of implied warranty of fitness, quality or workmanship from the specific exclusion relating to contractual liability. The exception remains subject to and limited by all other related exclusions contained in the policy. *When considered with exclusion (m) it clearly appears that property damage claims of third persons resulting from the insured's breach of an implied warranty are covered unless the claimed loss is confined to the insured's own work or work product.*

*Id.* (Emphasis added.) *But see, Applegren v. Milbank Mut. Ins. Co.*, 268 N.W.2d 114 (N.D.1978); *Aid Insurance Services, Inc. v. Geiger*, 294 N.W.2d 411 (N.D.1980).

Analogizing this language of the supreme court to the instant case, Defendant argues that Exclusion (f) in the Triple U policy does not create breach of warranty coverage. Defendant then extends this analogization to conclude that no insurance coverage exists for breach of warranty or for any alleged damages resulting therefrom, in light of exclusion (m). This Court cannot agree with this analysis. Although the *Haugan* court concluded that the alleged facts clearly subjected the owner's claim to the unambiguous provision of exclusion (m), the court noted that "[a]ccording to the allegations of the complaint ... the completed hangar building, in its entirety, constituted the contractor's work product." *Haugan*, 192 N.W.2d at 22. Further, the court observed that the "damages sought by [the owner] *relate solely* to [the contractor's] work product or to work performed by him in the construction of the building." *Id.* (Emphasis added.) In other words, the court recognized and held that the allegations of the complaint, including the damages claimed, were limited solely to the contractor's own work or work product. The court did not fashion an exclusive rule that breach of warranty is never covered under the policy. *Cf. American Employers' Insurance Co. v. Maryland Casualty Co.*, 509 F.2d 128 (1st Cir.1975) ("active malfunctioning" exception to business risk exclusion is covered). On the contrary, the supreme court specifically recognized such a possibility. "When considered with exclusion (m) it clearly appears that property damage claims of *third persons* resulting from the insured's breach of an implied warranty *are covered unless* the claimed loss is confined to the insured's own work or work product." *Haugan*, 197 N.W.2d at 22. (Emphasis added.)

This language comprehends the interrelationship, without conflict, of Exclusion (f), the exception to Exclusion (f), and Exclusion (m) in the Triple U policy. *Haugan* requires the interpretation that Exclusion (f) does not automatically extend or grant coverage to Plaintiffs for breach of warranty. *Id.* *Haugan* further requires the interpretation, however, that Heppers' damage claims resulting from Plaintiffs' alleged breach of warranty are covered if such damage is not confined to Plaintiffs' product and otherwise falls within the coverage provisions of the Triple U policy. *Id.* Accord, *Stillwater Condominium Assn. v. American Home Assurance Co.,* 508 F.Supp. 1075 (D.Mont.1981). *Contra, Fresard v. Michigan Millers Mut. Ins. Co.,* 97 Mich.App. 584, 296 N.W.2d 112 (1980). This Court's task therefore is narrowed to determining whether Heppers' claimed loss is so limited.

### D.

Exclusion (m) precludes coverage "to property damage to products ... sold ... by any insured...." Defendant argues that this exclusion is a "products exclusion clause" which excludes products liability and the damages alleged in Heppers' complaint. The Eighth Circuit, however, considered the function of this type of clause to be clear. "Such a provision denied coverage to an insured for damages occasioned to his own goods or work product by reason of its internal defectiveness." *Northern Grain Co.,* 365 F.2d at 368. The court further observed that "[this] exclusionary clause ... has no reference to damage to property other than the insured's goods or products or other accidental loss resulting from the defective condition of the insured's work product." *Id.* Because the exclusionary clause contained no such reference and because the court recognized a distinct and separate identity between wheat seed and the resulting wheat crop, the court held that the wheat crop was not encompassed within the exclusionary clause and, therefore, was covered under the policy. *Id.*

In the instant case, Heppers' complaint alleged damage not only to the buffalo sold, but also to the calves born. Analogizing the calves born to the wheat crop, this Court holds that the calves born constituted a separate and distinct entity from the original buffalo sold. *Id.* The damage to the calves born, therefore, is not within Exclusion (m). *Id.; see Haugan,* 197 N.W.2d at 22; *Dakota Block Co.,* 132 N.W.2d at 830.

### E.

Defendant argues strenuously, and this Court recognizes, that the insurance policy in the *Northern Grain* case contained express coverage for "products hazard and completed operations liability." Defendant contends that because the Triple U policy does not contain such coverage, Plaintiffs are attempting to create "products hazard" insurance where none exists. Defendant maintains that the holdings and decisions in *Northern Grain* were based on this "products hazard" policy, which significantly distinguishes it from the Triple U policy.

■ This argument raises the question whether Plaintiffs needed to purchase such additional coverage to be covered for such a risk under the Triple U policy. This question, however, is tied inextricably to the dispositive issues of this case, whether there is a duty to defend and whether there is policy coverage. It must be remembered that each coverage provision of each policy, along with its respective definitions and exclusions, must be read as separate and distinct. *National Farmers Union Property & Gas Co. v. Iverson,* 346 F.Supp. 660, 665 (D.S.D.1972). Consequently, in order to determine whether a certain risk, such as damage to a third party resulting from the insured's defective product, is covered, this Court must look to the general insuring clause and definitions applicable to the Triple U policy to determine what is included in it, as well as to the exclusions to determine what is excluded from it. *St. Paul Fire and Marine Ins. Co. v. Three "D" Sales, Inc.,* 518 F.Supp. 305, 311 (D.N.D.1981). *See generally* Annot. 91 A.L.R.3d

921 (1979). This Court has done that. Because there is no applicable provision in the Triple U policy excluding products hazard coverage and because this Court already has held that Exclusion (m) does not preclude coverage for damage to calves born, this Court cannot sustain Defendant's argument.

■ Based upon the foregoing, this Court holds that Defendant had a duty to defend Heppers' claim for damage to calves born and that Defendant has breached that duty.

## V.

### A.

■ It is settled insurance law that the expenses incurred by Plaintiffs in defense of Heppers' state court action are recoverable from Defendant due to its breach of contract under the Triple U policy. *Luke v. American Family Mut. Ins. Co.,* 476 F.2d 1015 (8th Cir.1973), *cert. denied,* 414 U.S. 856, 94 S.Ct. 158, 38 L.Ed.2d 105 (1973); *Shepard v. Milbank Mut. Ins. Co.,* 437 F.Supp. 744, 749–50 (D.S.D.1977), *aff'd in part and rev'd in part,* 579 F.2d 477, 479 (8th Cir.1979). *See Scherf v. Myers,* 258 N.W.2d 831 (S.D.1977); *Wilson v. Allstate Ins. Co.,* 85 S.D. 553, 186 N.W.2d 879, 882 (1971); Annot., 41 A.L.R.2d 434, 437 (1955); 7A J. Appleman, *supra,* §§ 4689, 4691. Plaintiffs assert that Exhibit 13 of the L.R. Houck Affidavit details the reasonable and necessary expenses incurred by Plaintiffs in defense of the state court action, in the amount of $54,800.60. This Court does not agree that Exhibit 13 provides sufficient detail and, therefore, directs Plaintiffs to submit a more particularized statement of expenses incurred, within 15 days ·of the date of filing of this opinion. Defendant may respond to such statement, if it so desires, within ten (10) days thereafter.

### B.

The issue yet to be resolved is whether Defendant is liable for the entire amount of the judgment entered against Plaintiffs in the state court action. This Court is persuaded by the principles and reasoning in *Space Conditioning, Inc. v. Insurance Company of North America,* 294 F.Supp. 1290 (D.Mich.1968), *aff'd,* 419 F.2d 836 (6th Cir.1970). In that case, some damage claims were within the coverage of the insurance policy and some were not. The jury awarded a general verdict and was not asked to and did not indicate how it allocated damages. Because the district judge simply could not decide what items of damages made up the total verdict, the court held that the insurer was liable to the insured for the entire amount paid in satisfaction of the judgment. *Space Conditioning, Inc.,* 294 F.Supp. at 1296, *aff'd,* 419 F.2d at 837. · The court reasoned that any other result would allow the insurer to profit from its wrongful refusal to defend. *Id.*

In the instant case, the jury entered a general verdict in the amount of $286,-232.00. Some claims in the state court complaint were not within the coverage provisions of the Triple U policy, but one claim was within such provisions. This Court is concerned with regard to that one claim within policy coverage, *i.e.,* damage to calves born, in relation to the jury instructions given at ·the state court trial.

The judge in Heppers' state court action instructed the jury that they may fix reasonable and fair compensation for any of the following elements of detriment or damage:

(1) The difference, at the time and place of acceptance, between the value of the goods accepted and the value they would have had if they had been as warranted.

(2) The loss of any calf crop that was the proximate result of the breach of any warranty of the defendants.

(3) Any expenses for veterinary services and medicines that were the proximate result from the breach of any warranty of the defendants.

(4) Any costs for extra feed and care of the animals that were the proximate result of the breach of any warranty of the defendants.

(5) Any costs for disinfecting in an effort to eradicate the disease for the premises wherein the diseased animals were kept that were the proximate result of the breach of any warranty of the defendants.

(6) Any direct injury to the business of the plaintiff that proximately resulted from the breach of any warranty of the defendants.

Exhibit 15, Jury Instructions No. 22, L.R. Houck Affidavit. This Court requests that the parties supplement their existing record with their position concerning whether the claim in the complaint for damage to calves born was presented to the jury, and if not, whether there is an issue preserved for appeal regarding this damage item, within 15 days of the filing of this opinion.

Additionally, item 5 in the above-quoted instruction refers to damages to the premises for eradication of the disease. This particular claim was not alleged either in the original or the amended complaint. According to the record before this Court it appeared for the first time in the jury instructions. This Court requests that the parties further supplement the record with their position regarding the effect of the jury instructions on damage to premises, within 15 days of the filing of this opinion.